UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MELIDA BALVINA ALFORD,            :
    Plaintiff,                :
                              :
v.                                :    CASE NO. 3:17-cv-358(RNC)
                              :
ANDREW SAUL,[1]                   :
COMMISSIONER OF SOCIAL            :
SECURITY,                         :
    Defendant.                :

**RULING AND ORDER**

Plaintiff brings this action pursuant to section 205(g) of

the Social Security Act, 42 U.S.C. § 405(g), seeking review of

the Commissioner's final decision denying her application for

disability insurance benefits.  Plaintiff moves for an order

reversing the decision, contending that her waiver of the right

to counsel was not knowingly and intelligently made, the

Administrative Law Judge ("ALJ") failed to adequately develop the

record, and the ALJ's findings are not supported by substantial

evidence.  Defendant moves for an order affirming the decision.

After careful consideration of the entire administrative record,

I conclude that the case must be remanded for a number of

reasons, most importantly to enable the Commissioner to more

fully investigate and assess the impact of plaintiff's chronic

pain on her capacity to work.  The Commissioner discounted

---

[1] Andrew Saul was sworn in as Commissioner of Social Security on
June 17, 2019, and is automatically substituted as the defendant
in this action.  <u>See</u> Fed. R. Civ. P. 25(d).

plaintiff's complaints of chronic pain, even though no medical provider had ever done so in the lengthy history of plaintiff's medical treatment. And the Commissioner did so in large measure because plaintiff's complaints were deemed to be inconsistent with her attempts to work as a home health aid. On the existing record, this appears to be a case in which the Commissioner made the error of penalizing a claimant for enduring the pain of her disability in order to earn money to support herself. See Woodford v. Apfel, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000).

## I. Background

### A. Relevant Medical History Prior to Claimed Disability Onset

Plaintiff has an "extremely long and complicated [medical] history," R. 371, encompassing numerous ailments. Primary among them is an extensive history of back, hip, and leg pain, the cause of which appears to be a motor vehicle accident in her youth.[2] Stipulation of Facts (ECF No. 23-2) at *1-*2. The accident caused a fracture of her right femur, which led to an inequality in adult leg length of 1-2 centimeters, resulting in

---

[2] On November 17, 2006, plaintiff's orthopedic surgeon wrote, "[Sh]e actually had a trauma as a young child with a fracture of the right femur. . . . She did injure the left hip at the same time." R. 375. At a follow-up following her left hip replacement, the same surgeon wrote, "She had originally injured the operative left hip as well as the right hip in a [motor vehicle accident] in the 1970's . . . ." R. 378. Plaintiff was born on March 31, 1955, and so would have been at least 14 during the 1970's. Yet another record blames a motor vehicle accident taking place in 1981. R. 371. The exact genesis of her pain is therefore unclear.

back, hip, and leg joint pain.  R. 378.  At some point following
the accident, plaintiff received an "open reduction internal
fixation with femoral rodding" in her right femur.  R. 371; see
also R. 375 (orthopedic surgeon noting that "[t]he right side is
not arthritic but does have hardware in the femur"), 609
(radiologist noting a "right side fixation plate and femoral
compression screw").

Plaintiff sought medical attention for her pain on July 24,
2006; a subsequent x-ray was interpreted by a radiologist to show
"severe degenerative disease involving the left hip."
Stipulation at *1-*2.  As a result, plaintiff underwent a total
left hip replacement on January 16, 2007. Id. at *2.  That
operation "probably exacerbated" her leg length discrepancy to 3
centimeters, leading her orthopedic surgeon, Dr. Peter Boone, to
recommend a lift be added to her right shoe.  R. 378.  Plaintiff
had several follow-ups with Dr. Boone in 2007.  R. 378, 380, 381.
At the last, on July 11, 2007, she reported continued discomfort
while walking.  Stipulation at *2-*3.  Dr. Boone noted that
plaintiff "[wa]s not ready for full time work" but could
"probably do part time clerical work using the cane to help
support her." Id. at *3.

The next event of note took place in October 2010, when
plaintiff saw Dr. Boone for right hip pain after slipping and
falling while at work in a daycare facility.  R. 382.  She

3

followed up with complaints of pain in December 2010, Stipulation at *3, and received a cortisone injection at the site of maximum discomfort in January 2011.  R. 384.  In August 2011, Dr. Boone noted that plaintiff was continuing to experience discomfort, particularly "when she is standing for long periods" or when "lying on her side," despite her use of extra-strength Vicodin. R. 385.  At the same time, plaintiff also reported sensitivity along her right femur.  Stipulation at *3.  Dr. Boone theorized that she was experiencing "remodeling pain" from the interaction between her femur and the attached plate, which was "so old that it has cruciate-headed screws" and "ha[d] remodeled distally to such an extent that it is almost interosseous."[3]  Id.

B. Relevant Medical History After Claimed Disability Onset

On March 5, 2012, plaintiff's alleged onset date, R. 234, she fell at work.  She told her surgeon she "slipped on water, landing on her back" and then fell again, this time landing on her right knee.  Stipulation at *3-*4.  The surgeon wrote, "She states that her knee has been buckling. She has been wearing a knee brace.  She has been using a cane and has had a lot of problems."  Id. at *4.  The surgeon ordered an MRI of plaintiff's spine, which revealed "L5-S1 degenerative changes[,] . . . associated central canal stenosis without nerve root

_____

[3] An interosseous implant is one that has moved between its host bone and the adjoining bone–in this case, because the movement was distal (i.e. away from the center of the body), the knee.

4

compression," and "[m]oderate facet joint degenerative changes at L4-5 which have progressed." Id. at *4.

On June 25, 2012, plaintiff had an initial evaluation with a pain specialist, Dr. Pardeep Sood. Id. Dr. Sood wrote:

> She presents with chief complaints of constant low back pain that radiates down both the legs to the level of the feet. This is described as sharp pain rated at a severity of 10/10. The pain increases with activity, with bending, twisting as also over the course of the day. She denies any relieving factors beyond medications. She denies any associated numbness or weakness.
> She also complains of neck pain that goes into both shoulders and into upper extremities, left more so than right. This is again described as sharp pain rated at a severity of 8-9/10. The pain increases with activity and at other times unpredictably so. She denies any relieving factors beyond medications that helps her some.

R. 371.

Dr. Sood described Plaintiff's gait as "antalgic" (i.e. designed to avoid pain) and noted her limp and use of a cane. R. 371. Plaintiff reported a decreased range of motion in her neck, upper spine, and lower spine, with associated pain in each area. R. 371. Because plaintiff "ha[d] failed to respond to conservative options alone and remain[ed] with high levels of pain," Dr. Sood recommended "more aggressive[]" approaches. R. 371. On July 16, 2012, plaintiff received a series of transforaminal injections in her lower back. Stipulation at *5.

On August 10, 2012, plaintiff had a psychiatric consultation with a colleague of her orthopedic surgeon, Dr. Isaac Cohen.[4]

---

[4] Dr. Cohen described plaintiff as having a "history of bilateral total hip replacement." R. 390. Based on descriptions from the

5

Stipulation at *5.  He noted that the injections had provided plaintiff "with a little bit of relief," but "wore off after several weeks."  Plaintiff had "returned to see [the pain specialist] and he wanted to repeat back injections but she state[d] that she is not accustomed to having anyone stick a needle in her body."  Id.  Dr. Cohen also noted that the pain specialist had prescribed oxycodone and "ha[d] her out of work." R. 449.

On August 24, 2012, noting that the transforaminal injections had provided a "good response" in the past, Dr. Sood repeated the procedure in response to "recurrence/increased pain of late."  R. 368.  On September 12, 2012, it was noted that plaintiff again had a "good response" to the injections, which led to her pain levels being "tolerable for a few weeks."  He noted that plaintiff's prescription medications were "helpful": oxycodone (a narcotic "used to relieve moderate to severe pain");[5] mobic (an anti-inflammatory "used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthiritis . . . and rheumatoid arthritis");[6] neurontin (an anti-seizure

radiologist and the doctor who performed plaintiff's left hip replacement-both of whom noted surgical implants on the right femur, but did not mention a total right hip replacement-this does not appear to be accurate.  See R. 375, 609.
[5] Oxycodone, Medlineplus.gov, Drugs, Herbs & Supplements, https://medlineplus.gov/druginfo/meds/a682132.html (last revised Jan. 15, 2019).
[6] Meloxicam, Medlineplus.gov, Drugs, Herbs & Supplements, https://medlineplus.gov/druginfo/meds/a601242.html (last revised

drug often used to treat nerve pain, particularly in people, like plaintiff, who have diabetes);[7] and soma (a muscle relaxant used to treat pain).[8]  R. 367.  On November 9, 2012, plaintiff visited Dr. Sood again, reporting a pain level of 8/10 in her lower back radiating to her right leg.  Stipulation at *6.

In early-to-mid 2013, plaintiff repeatedly visited an urgent care facility in Bridgeport, each time seeking help for pain. Id. at *6-*7.  At the time, she reported that she was seeing a specialist for a torn rotator cuff, although no records of such a visit are in the record.  Id. at *7.  The urgent care facility urged her to visit a primary care physician, rather than rely on the facility for pain management.  Id. n.8.  The record indicates that plaintiff had lost her insurance and was thus unable to continue treatment with Dr. Sood.  R. 410.

On June 27, 2013, plaintiff saw a new pain management specialist, Dr. Charles Bruce-Tagoe, and was diagnosed with Chronic Pain Syndrome.  Stipulation at *7.  Dr. Bruce-Tagoe prescribed various pain medications, and entered into a pain management contract with plaintiff.[9]  Id.  Dr. Bruce-Tagoe

_____

July 15, 2016).
[7] Gabapentin, Medlineplus.gov, Drugs, Herbs & Supplements, https://medlineplus.gov/druginfo/meds/a694007.html (last revised Nov. 15, 2017).
[8] Carisoprodol, Medlineplus.gov, Drugs, Herbs & Supplements, https://medlineplus.gov/druginfo/meds/a682578.html (last revised Oct. 15, 2018).
[9] Pain management contracts are agreements entered into between patients and doctors prescribing opioid painkillers, given the

continued to treat plaintiff for Chronic Pain Syndrome and
continued to provide her with prescriptions for several
painkillers while she remained in Connecticut. Id. at *7-8.[10]

Plaintiff moved to Georgia in mid-2014. R. 93. In December
2014, a mammogram revealed a "new palpable mass." Stipulation at
*9. Id. at *7-8. In March 2015, plaintiff went to Grady
Hospital in Atlanta, where she sought primary care as a new
patient. Id. at 9. At that time, the following problems were
identified: "symptoms concerning for diabetic neuropathy
including recent onset blurry vision and shoot[ing] pain . . . in
her [lower extremities]," uncontrolled hypertension, and
degenerative joint disease, featuring "chronic complain[t]s of
pain in her lower back." R. 507.[11] Plaintiff was subsequently
diagnosed with primary open-angle glaucoma in both eyes.

---

serious potential for addiction. See, e.g., A Standard Pain
Management Contract, N.Y. Times (Mar. 16, 2016),
https://www.nytimes.com/interactive/2016/03/16/health/pain-manage
ment-contract.html.
    Plaintiff's pain management contract does not appear in the
record, which merely states "pain contract to be signed," R. 471,
although the parties stipulate that the "pain contract was
signed" on June 27, 2013. Stipulation at *7.
[10] The record contains no entry by a medical professional
expressing concern about potential abuse of prescribed
medications. See R. 137 ("There is no evidence of any substance
abuse disorder/[drug addiction and alcoholism] issue."). At one
point, however, plaintiff herself expressed an interest in the
possibility of using medical marijuana in order to discontinue
her reliance on opioids. R. 755.
[11]The diagnosis and Stipulation also mention hyperlipidemia, an
abnormally high concentration of fat particles in the blood.

Stipulation at *9-*10.  In addition, she was diagnosed with Stage II breast cancer.

In April 2015, plaintiff began chemotherapy.  Her oncologist, Dr. Hiba Tamim, sought to refer her to a pain specialist for "degenerative joint disease with chronic pain syndrome."  Id. at *10-*11.  On April 23, 2015, Dr. Tamim noted that the chemotherapy was aggravating plaintiff's chronic pain.  Id., at *11.  Plaintiff was unable to afford treatment at the Emory pain clinic, and could not be seen by the Grady pain clinic until August.  Id.  In the meantime, Dr. Tamim prescribed a small number of Percocet tablets for plaintiff "to use sparingly" during chemotherapy to manage the worst of the pain.  R. 740.

In June 2015, plaintiff was seen by a pain management specialist, Dr. Justin Ford.[12]  Stipulation at *12.  He noted that she reported "low back and right leg pain" rated at a severity from 5-8 out of 10, which was present about 75% of the day and night.  R. 754.  He prescribed a month's worth of oxycodone.  R. 755.  On June 18, 2015 – the last record available to the ALJ – Dr. Tamim wrote that plaintiff "reports . . .

---

[12] Dr. Ford noted that plaintiff was first seen by the pain clinic on May 11, 2015 "for a chief complaint of back pain."  R. 754.  The record of that visit is not in the administrative record.  As relayed by Dr. Ford, at that visit, an MRI of the spine was ordered and plaintiff was directed to begin physical therapy.  R. 754.  However, plaintiff informed him that her insurance provider denied the MRI and directed her to participate in physical therapy prior to any diagnostics.  R. 754.

feeling more depressed.  She is crying more on a regular basis

lately."  R. 760.  Dr. Tamim thought plaintiff's depression could

be due to "the stress of [breast cancer] treatment" and her

"chronic pain" and referred her to a psychiatrist.  R. 762.

C. Medical History After The ALJ Decision[13]

On June 25, 2015, Dr. Tamim noted that plaintiff "report[ed]

depression" and "numbness and tingling in her fingers and . . .

toes."  Stipulation at *13.  At some point between August 26 and

September 30, 2015, plaintiff underwent a lumpectomy to treat her

breast cancer.  Id.  Subsequently, she started a new, six-week

course of radiation therapy.  Id. at *14.  Plaintiff informed Dr.

Tamim that she was experiencing new pain in her right shoulder

and was following up with her pain management clinic and an

orthopedic doctor.  Id.

On March 15, 2016, plaintiff was seen by an eye specialist,

who noted that plaintiff's glaucoma in both eyes had reached a

"severe stage."  Id. at *15.

Notes from March 22, 2016 indicate that the pain clinic was

continuing plaintiff's prescription of 10mgs of Oxycodone three

times a day.  Id.  Dr. Tamim also reported that "she had] been

_____

[13] The following medical history was not presented to the ALJ but
was made available to the Appeals Council on Plaintiff's appeal
of the ALJ decision.  See Perez v. Chater, 77 F.3d 41, 45 (2d
Cir. 1996) ("[W]e hold that the new evidence submitted to the
Appeals Council following the ALJ's decision becomes part of the
administrative record for judicial review when the Appeals
Council denies review of the ALJ's decision.").

more depressed, crying at times." Id.  On July 6, 2016,
Plaintiff reported to Dr. Tamim that she was taking 5 mg of
oxycodone three times a day.  R. 50.  The final medical record
available in the administrative record is from plaintiff's
follow-up visit with Dr. Tamim on September 6, 2016, at which
time she  reported that she was moving back to Connecticut
following the loss of her son.  Stipulation at *15.  On that
visit, Dr. Tamim recorded a "Pain Score" of 8, marked "HIGH."  R.
60.

D. Work History

    Plaintiff has a Bachelor's degree in psychology and an
extensive work history in social work and human services.  R. 97.
At the hearing conducted by the ALJ, a vocational expert
testified that plaintiff had worked in the following occupations:
family care worker or case worker (sedentary, skilled); program
director or volunteer services supervisor (light, skilled); child
development center director (sedentary, skilled); case manager
(light, skilled); home health aid (medium, semi-skilled); patient
transporter (medium, unskilled); and dispatcher (sedentary,
skilled).

    At the hearing, plaintiff testified that she was currently
working as a home health aid four or five days a week.  R. 97.
She was working either two or four hours a day.  R. 96 ("I only

work sometimes.  I would work four hours a day, nine – at $9."),
R. 97 ("I have to work two hours a day.").  Plaintiff described
the work in terms of her duties to clients: she had to "dress
them, shave them, go to the store for them . . . ma[k]e sure they
had their medicine. . . . [and] clean their homes."  R. 92.  She
made clients' beds daily, R. 105, and bathed them, R. 92, but
could not lift them, R. 105.  The work left her "in excruciating
pain at night."  R. 106.

E. <u>The ALJ Decision</u>

The ALJ concluded that plaintiff was insured for purposes of
Title II of the Social Security Act through September 30, 2019.
R. 67.  Attempting to parse plaintiff's employment record, the
ALJ gave her "the benefit of the doubt."  R. 68.  Thus, although
the ALJ found that plaintiff was engaged in substantial gainful
activity in the third quarter of 2012, the third quarter of 2013,
and the second, third, and fourth quarters of 2014, the ALJ
nonetheless concluded that there was a continuous 12-month period
in which plaintiff did not engage in substantial gainful
activity.  R. 68.

The ALJ concluded that plaintiff suffered from "severe
impairments" of degenerative disc disease and breast cancer grade
II, and non-severe impairments of "hypertension, diabetes
mellitus, glaucoma, osteoporosis, [and] history of reconstructive
hip surgery."  R.68.  The ALJ also found that plaintiff's

reported depression was "secondary" to the breast cancer diagnosis, and not a "medically determinable mental impairment." R. 69. The ALJ concluded that none of plaintiff's impairments, nor any combination of them, met or equaled in severity a "Listed Impairment" that would entitle her to a per se finding of disability. R. 69-70.

As to whether plaintiff was disabled, the ALJ wrote:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant is able to lift and carry up to 20 pounds occasionally and 10 pounds frequently; she is able to stand and walk four hours, and sit six hours, in an eight-hour workday with normal breaks; she is able to occasionally climb ramps and stairs but should never climb ladders, ropes, or scaffolds; she is able to occasionally balance, stoop, kneel, crouch, and crawl; she is able to occasionally operate left foot controls; she is able to frequently reach overhead with the right arm; and she requires the use of a cane to ambulate to and from the workstation and traverse uneven surfaces; and she will be off task up to, but not more than, 10 percent due to pain.

R. 70.

The ALJ further concluded that plaintiff was "capable of performing past relevant work as a case manager . . . case worker . . . program director of volunteer service . . . child development center director . . . and dispatcher." R. 74. Given this conclusion, plaintiff could not be considered disabled within the meaning of the Act and her application for benefits was therefore denied. R. 74-75.

II. <u>Legal Standard</u>

Under the Social Security Act, a person is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Act is a "remedial statute, to be broadly construed and liberally applied." <u>Gold v. Sec'y of Health, Educ. & Welfare</u>, 463 F.2d 38, 41 (2d Cir. 1972) (quoting <u>Haberman v. Finch</u>, 418 F.2d 664, 667 (2d Cir. 1969)).

A disability determination under the Act proceeds in five steps. First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If not, the Commissioner determines whether the claimant has a "severe medically determinable physical or mental impairment" that limits the claimant's ability to do basic work activities. If so, the Commissioner asks whether the impairment meets, or equals in severity, a so-called "listed impairment," contained in Appendix 1 to Subpart P of 20 C.F.R. § 404. If so, provided the claimant meets the Appendix's durational requirements, the Commissioner will find that the claimant is disabled. If not, the Commissioner determines whether, despite the impairment, the claimant retains the "residual functional capacity" ("RFC") to

14

perform his or her past work.  Finally, if the claimant does not have the RFC to perform his or her past work, the Commissioner determines whether there is other work in the national economy that the claimant is capable of performing.[14]  Until the final step, the claimant bears the burden of proof, but if the analysis reaches the fifth stage, the burden shifts to the Commissioner. McIntyre v. Colvin, 758 F.3d 146, 150 (2d Cir. 2014).

In reviewing a final decision of the Commissioner, a district court "perform[s] an appellate function."  Zambrana v. Califano, 651 F.2d 842, 844 (2d Cir. 1981).  The court's role is limited to determining (1) whether the decision comports with applicable law and (2) whether it is supported by substantial evidence.  Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987). If a decision is free of legal error, the findings of the Commissioner as to any fact, "if supported by substantial evidence, [are] conclusive."  42 U.S.C. § 405(g).  The findings must be supported by "more than a mere scintilla or a touch of proof here and there in the record," but require only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

---

[14] In this case, the ALJ did not make a finding as to step five. Stipulation at *18.

III. <u>Discussion</u>

Plaintiff moves to reverse the Commissioner's decision on the grounds that (1) her waiver of the right to representation was not knowingly and intelligently made; (2) the ALJ failed to develop the administrative record; (3) her claims of pain were inadequately evaluated; and (4) the ALJ's vocational analysis is flawed. I agree that plaintiff did not knowingly and intelligently waive her right to counsel and that prejudice resulted from her lack of representation. Wholly apart from the waiver issue, I conclude that a remand is necessary primarily because the ALJ did not fully develop the record as to the severity and impact of plaintiff's chronic pain and glaucoma, which may well limit her ability to perform her past work.

A. <u>Waiver of Right to Representation</u>

"Although a claimant does not have a constitutional right to counsel at a social security disability hearing, she does have a statutory and regulatory right to be represented should she choose to obtain counsel." <u>Lamay v. Comm'r of Social Sec.</u>, 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. § 406; 20 C.F.R. § 404.1705). The statute and regulations require the Commissioner to "notify the claimant in writing of (1) her options for obtaining an attorney to represent her at her hearing, and (2) the availability . . . of . . . organizations which provide legal services free of charge to qualifying

claimants." Id. (internal quotations and alterations omitted). The ALJ must also ensure at the hearing that the claimant is aware of her right to representation. Id. (quoting Robinson v. Sec'y of Health & Human Servs., 733 F.2d 255, 257 (2d Cir. 1984)). The right to representation is subject to waiver. Id.

Critically, the law of this Circuit requires the Commissioner to inform a claimant of the right to be represented by a lawyer. Lamay, for instance, speaks of the claimant's right to representation by "counsel" and indicates that the Act and regulations require notification of options "for obtaining an attorney" as well as the availability of organizations providing "legal services." Id.; see also Robinson, 733 F.2d at 257 ("The claimant is entitled to be represented by counsel at the hearing and the ALJ must ensure that the claimant is aware of this right.") (emphasis added). Accordingly, in this Circuit, notifications that inform claimants of the right to "representation" or to a "representative" without making clear that the representative can be a lawyer are deemed inadequate. E.g., Petrovich v. Colvin, No. 3:15-cv-00575 (AVC), ECF No. 27, at *50 (D. Conn. Aug. 14, 2017); Sheerinzada v. Colvin, 4 F. Supp. 3d 481, 495-96 (E.D.N.Y. 2014); Holliday v. Astrue, No. 05-cv-1826(DLI)(VVP), 2009 WL 1292707, at *10-*11 (E.D.N.Y. May 5, 2009).

1. <u>Factual Background</u>

After filing her initial request for a hearing before an ALJ, plaintiff received a letter from the Office of Disability Adjudication and Review in New Haven.  The letter mentioned a "Right to Representation" but did not mention a right to legal counsel.  R. 180.  The letter was accompanied by a pamphlet titled "Your Right to Representation," R. 183-84, which did explain the right to representation by a lawyer.  The letter also contained an "Important Notice About Representation," which included contact information for the National Organization of Social Security Claimant Representatives and a variety of legal aid organizations in Connecticut (and, for reasons that are not clear, Ohio).  R. 185-88.

Plaintiff subsequently received a written reminder about her hearing, which stated she could seek "help" from a "representative" without mentioning the possibility the representative could be a lawyer.  R. 194.  This correspondence also contained the same pamphlet referencing the right to representation by counsel.  R. 198-99.  It did not contain contact information for any lawyers or legal services organizations.

On August 15, 2014, the Covington, Georgia Office of Disability Adjudication and Review acknowledged the transfer of plaintiff's claim.  R. 210.  The Covington office sent plaintiff

a letter like the one sent to her initially, which did not mention the right to a lawyer.  Compare R. 180 with R. 211.  As before, this letter was accompanied by the pamphlet, "Your Right to Representation." R. 214-15.

Of considerable importance to the efficacy of the waiver in this case, the letter transmitted by the Covington also contained an "Important Notice About Representation" similar to the one initially provided in Connecticut.  But there is a key difference between the two: rather than providing contact information for national or Georgia-based legal services organizations, this "Important Notice" contained a series of blanks.  The form states: "**If you want an attorney to help you**, you may contact the organization(s) listed below."  No organizations are listed.  It continues: "**If you cannot pay for legal representation** and you think you might qualify for free legal help, you may contact the organization(s) listed below."  Again no organizations are listed.  It then states: "**If you want someone who is not an attorney to help you**, you may contact the organization(s) listed below."  As before, no organizations are listed.  R. 216.

Another reminder letter followed.  The letter did not mention the right to be represented by a lawyer.  The pamphlet entitled "Your Right to Representation" was enclosed.  R. 217-27.

On the morning of the hearing, plaintiff completed a "Waiver of Right to Representation," which at several points mentions the possibility of representation by an attorney. R. 231. Plaintiff takes issue with the form's statement that "[s]everal of these [legal service] organizations were named in the information previously sent to you after you requested this hearing." As just discussed, no names of organizations had been provided by the Covington office.

At the hearing, the ALJ sought to confirm that plaintiff was knowingly waiving her right to representation. The discussion proceeded as follows:

ALJ: As you're not represented, I need to ensure, on the record, that you understand that you have the right to representation. A representative may not charge you a fee, unless we approve it. Did you receive the hearing letter enclosures, and did you understand the information contained therein?

CLMT: Uh-huh. Yes. I – I — we went through it briefly.

ALJ: Okay. I just have to ensure, on the record, --

CLMT: Uh-huh

ALJ: – and that you understand that you have a right to representation –

CLMT: Yes.

ALJ: – by an attorney or non-attorney.  I also have
     here, in front of me, where you have signed a
     waiver of representation form, indicating that you
     would like to proceed today without representation.
     Is that correct?

CLMT: Yes.

HR: (Indicating.)

ALJ: Thank you.  You've indicated, on the record, you'd
     like to proceed without representation, and we will
     do so.

R. 84-85.

Plaintiff alleges that this "passing reference" to an
attorney was inadequate, especially in light of the "Important
Notice About Representation" she had received from the Covington
office, R. 216, which contained no names of legal service
providers.  The Commissioner responds that the ALJ's colloquy
with plaintiff was sufficient and plaintiff could have contacted
organizations from the list she received in Connecticut or other
providers.

2. <u>Analysis</u>

    I. <u>Pre-Hearing Notices</u>

The Commissioner is required to "notify the claimant in
writing of (1) her options for obtaining an attorney to represent

her at her hearing, and (2) the availability of organizations
which provide legal services free of charge to qualifying
claimants." Lamay, 562 F.3d at 507 (internal quotations and
alterations omitted).  I find that, in sending plaintiff the
"Important Notice About Representation," the Covington office did
not fulfill the latter step.  Plaintiff could read this
"Important Notice" to mean that no legal service providers were
available to assist her.  The statements, **"If you want an
attorney to help you**, you may contact the organization(s) listed
below," and **"If you cannot pay for legal representation** and you
think you might qualify for free legal help, you may contact the
organization(s) listed below," followed by blanks in both
instances, certainly give that impression.

   The problem created by the blanks in the form was compounded
by the written waiver plaintiff signed on the morning of the
hearing, which referred back to the information provided – or, in
this case, not provided – in the "Important Notice About
Representation.  The waiver reads:

> If not represented now, you should understand that you
> have the right to seek to be represented, at your own
> expense, at your hearing. If you cannot afford an
> attorney or other representative, there are some
> organizations which may provide representation at no cost
> to you.  Several of these organizations were named in the
> information previously sent to you after you requested
> this hearing.

R. 231.

The effect of this language was to reinforce the implication
of the "Important Notice" that there were no legal aid
organizations available to help.  A reasonable claimant could
conclude that if legal aid organizations were available, they
would be listed in the "Important Notice."

The Commissioner's answer – that plaintiff could have
contacted an organization on the list she received in Connecticut
– is insufficient.  The list of primarily Connecticut- and Ohio-
based organizations provided to plaintiff in Connecticut was sent
on September 27, 2013.  R. 180.  Plaintiff's hearing took place
more than a year later, on December 23, 2014, approximately 800
miles from Connecticut.  It was, for all intents and purposes, a
different hearing.  The Commissioner should have sent a new list,
as the Covington office seems to have recognized.  The presence
of one or two national organizations on the Connecticut list does
not change this analysis – the names of those organizations
should have been provided by the Covington office prior to the
hearing.

It is no more responsive to suggest that plaintiff could
have contacted a legal organization of her own choosing, based on
her own research.  The Commissioner has the responsibility to
"notify the claimant in writing of . . . the availability . . .
of . . . organizations which provide legal services free of

charge to qualifying claimants" prior to her hearing.   <u>Lamay</u>,
562 F.3d at 507 (internal quotations and alterations omitted).
That did not happen here.   <u>See</u> <u>Petrovich</u>, No. 3:15-cv-00575
(AVC), ECF No. 27, at *44 (noting failure of Commissioner to
provide a list of organizations, although deciding on other
grounds).

        ii.   <u>Hearing Notice</u>

The hearing transcript provides no assurance that plaintiff
knowingly waived her right to counsel.  When asked whether she
had received "the hearing letter enclosures" and whether she
understood the information they contained, plaintiff responded
"we went through it briefly."  R. 84-85.  That response does not
in itself support a valid waiver.  Several follow-up questions
were in order: who was the "we" plaintiff referred to, why did
plaintiff respond with the singular "it" when asked about plural
"enclosures," and how "brief" was her review?  In a typical case,
when a claimant has been given names of legal service providers,
a waiver obtained by an ALJ might withstand judicial review if
the transcript shows that the ALJ confirmed the claimant's
understanding of the right to representation "by an attorney or
non-attorney," as happened here.  R. 84-85.  But the "Important
Notice About Representation" plaintiff received from the
Covington office made it appear as if nobody was available to
assist her.  In this circumstance, the ALJ's colloquy was

insufficient to confirm that plaintiff understood the availability of free legal services. Compare with Rutkowsky v. Astrue, 368 Fed. App'x 226, 229 (2d Cir. 2010) (holding that, where the "ALJ verbally told [claimant] of his right to representation and the availability of free legal services during the initial and supplemental hearings," claimant had knowingly waived his right to representation). See also Collado v. Astrue, No. 05-cv-3337 (KMK)(LMS), 2009 WL 2778664, at *10 (S.D.N.Y. Aug. 31, 2009) ("Under the Lamay standard, an ALJ need[s to] . . . ensure . . . (2) that the notification provided to the clamant adequately informed the claimant of the availability of free legal services to assist him or her with the administrative review process . . . .").

Moreover, the transcript provides no assurance that plaintiff voluntarily waived her right to representation. The ALJ did not clearly state that if plaintiff chose to seek representation, the hearing would be postponed at no penalty to her. Compare with Lamay, 562 F.3d at 509 (noting that ALJ told claimant that "she could 'either . . . have a postponement of the hearing and get a lawyer or . . . [go] forward with the hearing today" and that claimant confirmed twice that "she preferred to proceed, alone, immediately") (alteration in original). This is a particular problem in this case due to plaintiff's condition at

the hearing.  During the hearing, plaintiff testified that she was having difficulty maintaining concentration and "f[ound] herself drifting" occasionally.  R. 110.  She was taking several medications, one of which she was unable to name until the ALJ corrected her, and one of which is a high-strength opioid.  R.98-99.  Under these circumstances, the ALJ's heightened duty to "scrupulously and conscientiously probe into, inquire of, and explore all the relevant facts surrounding" plaintiff's waiver required more than the brief exchange that took place.  See Mimms v. Heckler, 750 F.2d 180, 185 (2d Cir. 1984); see also Petrovich, No. 15-cv-00575 (AVC), ECF No. 27, at *47-48 (holding that ALJ's notice to claimant of right to counsel at hearing was inadequate in part due to claimant's educational background, testimony at hearing, and medications).

In the circumstances presented by this case, I conclude that the record is insufficient to support a finding that plaintiff knowingly and voluntarily waived her right to counsel.  It does not automatically follow that a remand is required, however. Remand is proper only when lack of counsel results in unfairness or prejudice to the claimant.  Alvarez v. Bowen, 704 F. Supp. 49, 52-53 (S.D.N.Y. 1989).  In this case, I conclude that plaintiff was prejudiced by the lack of representation.  Competent counsel could be expected to assist the ALJ in adequately developing the

record with regard to key issues.  As discussed below, the record is not adequately developed.

B. Failure to Adequately Develop the Record & Lack of Substantial Evidence for Certain Findings

Whether the administrative record has been adequately developed is "a threshold question" and, accordingly, before determining whether the ALJ's decision is supported by substantial evidence, "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record."  Craig v. Comm'r of Social Sec., 218 F. Supp. 3d 249, 261 (S.D.N.Y. 2016) (quoting Scott v. Astrue, No. 09-cv-3999 (KAM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010)); see also Rodriguez v. Barnhart, No. 09-cv-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.").  The ALJ's duty to develop the record is undertaken "on behalf of" the claimant, "in light of the essentially non-adversarial nature of a benefits proceeding." Craig, 218 F. Supp. 3d at 261.  When the claimant is proceeding without counsel, the ALJ's duty is "heightened."  Moran v. Astrue, 569 F.3d 108, 113 (2d Cir. 2009) (quoting Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990)).

When evaluating a pro se claimant's application, an ALJ must "ensur[e] all of the relevant facts are sufficiently developed and considered" by "scrupulously and conscientiously prob[ing] into, inquir[ing] of, and explor[ing] for all the relevant facts." Cruz, 912 F.2d at 11. It is a reviewing court's "duty to make a 'searching investigation' of the record" to ensure a pro se claimant's rights have been adequately protected. Gold, 463 F.2d at 43 (quoting Miracle v. Celebrezze, 351 F.2d 361, 383 (6th Cir. 1965)).

The applicable regulations require that the Commissioner "develop [claimant's] complete medical history for at least the 12 months preceding the month in which [claimant] files [his or her] application." 20 C.F.R. § 404.1512(b)(1). The Commissioner must "make every reasonable effort" to obtain medical evidence from the claimant's medical sources, including at least an initial request for medical evidence and a follow-up. Id. § 404.1512(b)(1)(I). The ALJ's responsibility also includes "the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." Craig, 218 F. Supp. 3d at 261 (quoting Pena v. Astrue, No. 07-cv-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008)). In some circumstances, the duty to develop the record may include a duty to order that the claimant undergo additional examinations or diagnostic testing,

if doing so is necessary for the ALJ to "resolve a conflict or ambiguity in the record." Phelps v. Colvin, 20 F. Supp. 3d 392, 401 (W.D.N.Y. 2014). Failure to obtain an examination necessary to an informed decision is error. Falcon v. Apfel, 88 F. Supp. 2d 87, 90-91 (W.D.N.Y. 2000).

An ALJ's ultimate conclusions might not change following adequate development of the record. Even so, a plaintiff is always entitled to a decision based on a fully developed record. See Lilley v. Berryhill, 307 F. Supp. 3d 157, 159-60 (W.D.N.Y. 2018) ("[W]here the record is not otherwise complete . . . the ALJ's duty to further develop the record is triggered, and the ALJ's failure to satisfy that duty is reversible error."); Ubiles v. Astrue, No. 11-cv-6340T (MAT), 2012 WL 2572772, at *10 (W.D.N.Y. July 2, 2012) ("The failure to develop the record cannot be harmless error [where] the ALJ relied on perceived gaps in the medical evidence to find Plaintiff not disabled.").

Here, the ALJ went to some length to develop the record. R. 85. Nonetheless, there remain significant gaps in the record that need to be addressed. Moreover, while it is within the ALJ's discretion to "determine the best way to resolve [an] inconsistency or insufficiency," inconsistencies or insufficiencies must be resolved in order to ensure the decision is based on substantial evidence. Hunter v. Berryhill, 373 F.

Supp. 3d 393, 398 (E.D.N.Y. 2019).  In this case, insufficiencies
in the record prejudiced plaintiff's claim.

    1. Plaintiff's Chronic Pain

    The crux of plaintiff's claim is that she has "chronic,
intractable pain in part resulting from her back, shoulder,
bilateral hip and knee conditions, conditions so severe as to
require her to take Oxycodone three times a day."  Plf.'s Mem.,
at *15-16.  Giving full and fair consideration to a claimant's
pain remains a challenge in disability benefits cases because
pain does not necessarily manifest in objectively measurable
ways.  To avoid unwarranted awards of disability benefits,
"statements about [a claimant's] pain or other symptoms will not
alone establish that [the claimant is] disabled." 20 C.F.R.
§ 404.1529.  Instead, "there must be objective medical evidence"
indicating the existence of "a medical impairment[] which could
reasonably be expected to produce the pain."  Id.

    The regulation's requirement of "objective medical evidence"
to establish the source of a claimant's pain does not mean that
subjective complaints of pain cannot support a finding of
disability.  The Second Circuit, interpreting essentially
identical regulatory language in 2003, cautioned that, "[a]s a
general matter, 'objective' findings are not required in order to
show that an applicant is disabled." Green-Younger v. Barnhart,
335 F.3d 99, 108 (2d Cir. 2003).  Thus, a claimant may be

disabled within the meaning of the Act by pain alone, but objective evidence must establish a cause for the pain. See Bunnell v. Sullivan, 947 F.2d 341, 347 (9th Cir. 1991) ("[Congress] recognized that pain may be disabling and that individuals truly suffering from disabling pain are entitled to disability benefits."); cf. 20 C.F.R. § 404.1529(c)(3) ("[S]ymptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone. . . .").

The Commissioner has assured claimants that in making a determination about the effect of pain on the individual's ability to work, the agency

> will consider your statements about the intensity, persistence, and limiting effects of your symptoms, and we will evaluate your statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether you are disabled. We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your history, the signs and laboratory findings, and statements by your medical sources or other persons about how your symptoms affect you. Your symptoms, including pain, will be determined to diminish your capacity for basic work activities to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence.

Id. at (c)(4).

I conclude that in this case, despite the ALJ's efforts, the record has not been adequately developed with regard to plaintiff's chronic pain and, consequently, the ALJ's findings as

to the credibility of plaintiff's subjective complaints are not
supported by substantial evidence.

I. <u>Inadequacies In The Record</u>

The record shows that plaintiff suffered a torn rotator cuff
at some point in 2012 or 2013.  Stipulation at *7.  Plaintiff
testified that she was involved in litigation regarding her
shoulders, R. 95, had an operation on her left shoulder, R. 101,
and was newly experiencing right shoulder pain.  R. 101.  She
rated the pain in her right shoulder at six, and testified that
medication had no effect on the level of pain.  R. 103.[15]  The
pain in her left shoulder was "about a three."  R. 103.  The
record shows that plaintiff reported her right shoulder pain to
her oncologist, who reported that plaintiff was following up with
a pain clinic and orthopedic doctor.  R. 36.

Apart from the foregoing, there is no evidence relating to
plaintiff's torn rotator cuff or the pain in her shoulders.  The
record is therefore insufficiently developed with regard to these
matters, and the ALJ did not remedy this insufficiency at the
hearing.  <u>See</u> <u>Craig</u>, 218 F. Supp. 3d at 261 (noting that ALJ's
duty to develop the record includes the duty to adequately
question the claimant at the hearing).  The lack of adequate

---

[15] Plaintiff started to say something else about her right
shoulder pain but was interrupted.  R. 103.  <u>See</u> <u>Losco v.</u>
<u>Heckler</u>,604 F. Supp. 1014, 1020 (S.D.N.Y. 1985) (remanding where
ALJ's questioning was cursory and lacked necessary follow-ups and
where ALJ appeared to deliberately avoid a line of questioning).

development of the record in this regard is potentially
significant to the disability determination.  Plaintiff's ability
to use her shoulders and arms goes directly to the ALJ's residual
functional capacity assessment.  See R. 70.  The ALJ discounted a
treating physician's opinion that plaintiff could lift no more
than five pounds based on plaintiff's subsequent medium-exertion
work, R.72, and determined that plaintiff could lift 20 pounds
occasionally.  R. 70.  But the ALJ did so without mentioning
plaintiff's shoulder impairments.  A remand is therefore
necessary to permit the record to be adequately developed.

Also absent from the record is a medical source statement
concerning plaintiff's physical limitations.  The ALJ examined
the opinions of treating physicians from "at or around the time
the claimant was injured at work and when she was beginning
chemotherapy," R. 73, as well as an April 2015 opinion from
plaintiff's oncologist, R. 74.  Those statements indicated that
plaintiff should remain out of work or engage in only sedentary
work.  R. 73-74.[16]  The statements were discounted because

---

[16] Dr. Tamim suggested that Plaintiff was able to perform light
or sedentary work.  R. 16, 19, 22, 28, 34, 37, 40, 43, 46, 49.
The ALJ at one point appears to acknowledge that Dr. Tamim's
opinion is only probative of the effect of Plaintiff's cancer and
cancer treatment on her ability to work, not her overall ability
to work.  See R. 72-73 ("The claimant's attending oncologist
noted the claimant was capable of performing sedentary to light
work.  As such, it does not appear that the claimant is
significantly limited by her breast cancer or required
treatment.").

I agree with the Commissioner that the medical evidence does

plaintiff engaged in medium-exertion employment after they were
made.  R. 73-74.  However, without further development of the
record, plaintiff's attempts to maintain employment do not
provide substantial evidence to support the ALJ's decision.
Plaintiff suffers from degenerative disc disease.  R. 68.  Her
treating physicians repeatedly held her out of work or said she
could engage only in sedentary work.  It is entirely plausible
that her medium-exertion work – i.e. physical activity well
outside the range recommended by her physicians – exacerbated her
impairments.  She testified, after all, that they caused her
excruciating pain.  R. 106.  That she managed to endure this pain
does not support a finding that she is capable of doing a greater
range of work than her treating physicians thought she was
capable of doing.  The record as it stands does not provide "the
overwhelmingly compelling type of critique that would permit the
Commissioner to overcome an otherwise valid medical opinion."
Burgess v. Astrue, 537 F.3d 117, 130 (2d Cir. 2008) (quoting Shaw
v. Chater, 221 F.3d 126, 135 (2d Cir. 2000)).

---

not indicate that Plaintiff's breast cancer or the treatment
thereof pose a significant restriction on her ability to work,
but I do not read Dr. Tamim to offer any opinion as to the effect
of Plaintiff's degenerative disc disease, chronic pain, glaucoma,
or various back, hip, and leg ailments on her ability to work.
See R. 51 (statement of Dr. Tamim suggesting that Plaintiff's
performance status was "fully active" and that Plaintiff was
"able to carry on all predisease activities without
restrictions").

Degenerative disc disease, for the most part, only gets worse, and treatment revolves around the management of pain rather than "curing" the natural and inevitable underlying cause.[17] The treating physicians' opinions as to the severity of plaintiff's disease and its impact on her ability to work are from 2012 and 2013. R. 73-74. The record indicates that plaintiff's treating pain management specialist in 2015 believed it was necessary to obtain an MRI of plaintiff's spine and therefore ordered one, but her insurance provider refused to cover it. R. 754. As a result, it appears that the last MRI plaintiff had of her back was in mid-2012, Stipulation at *4, or at least that this MRI is the last one on which a medical opinion in the record was formed.

In light of the nature of plaintiff's impairment, her testimony as to the severity of her lower back pain, and the lack of medical evidence in the record covering the entirety of her claimed disability period, the Commissioner is required to request: (1) additional diagnostic testing of plaintiff's lower back, and (2) a medical source opinion from a treating physician who has examined plaintiff's back more recently than 2012-2013, preferably one who has the benefit of diagnostic imaging. See Parker v. Callahan, 31 F. Supp. 2d 74, 78 n.10 (D. Conn. 1998)

---

[17] See Osteoarthritis, Merck Manual of Diagnosis & Therapy (20th ed. 2018), at 302.

("Courts have required ALJs to order x-rays to ensure development of a full and fair administrative record, but only when x-rays are entirely absent or have not been taken for a long period of time."), id. (collecting cases where courts have faulted the Commissioner for failing to order diagnostic testing).  Without this medical evidence, the ALJ's findings as to the credibility of plaintiff's complaints of pain are based on an inadequate record.  See Rivera-Cruz v. Berryhill, No. 16-cv-2060 (RNC), 2018 WL 4693953, at *8 (D. Conn. Sept. 30, 2018) ("[B]ecause the ALJ failed to properly apply the treating physician rule, 'the credibility evaluation is necessarily flawed.'") (quoting Mortise v. Astrue, 713 F. Supp. 2d 111, 124) (N.D.N.Y. 2010)).

ii. Lack of Substantial Evidence To Support Adverse Credibility Findings

Plaintiff has testified that her daily life is complicated by significant and sometimes excruciating pain.  The ALJ discredited this claim on the basis of various pieces of evidence.  Taken collectively, these pieces of evidence are insufficient to support the ALJ's adverse credibility finding. While an ALJ "is not required to explicitly analyze every piece of conflicting evidence in the record," she may not "'pick and choose' evidence in the record that supports [her] conclusions." Stacy D. v. Comm'r of Soc. Security, 358 F. Supp. 3d 197, 202

(N.D.N.Y. 2019) (quoting <u>Cruz v. Barnhart</u>, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004)).[18]

The pieces of evidence cited by the ALJ do not impeach plaintiff's testimony.  For instance, the ALJ notes that "[plaintiff] was noted to be asymptomatic in March 2014," R. 72, referring to a report by Dr. Bruce-Tagoe.  Dr. Bruce-Tagoe's report does state that, with respect to plaintiff's "Chronic Pain," she was "currently asymptomatic."  R. 459.  But, in the same visit, Dr. Bruce-Tagoe's analysis of plaintiff's musculoskeletal system notes that "[j]oints, bones, and muscles" were "[a]bnormal," and specifically mentions "[t]enderness over lower back."  R. 461.  Moreover, Dr. Bruce-Tagoe's assessment reiterated the diagnosis of Chronic Pain Syndrome, contained a "Plan" for the treatment of "Lower Back Pain," and wrote plaintiff a new prescription for Metaxalone, a painkiller.[19]  R. 461.  The record also indicates that plaintiff's oxycodone

---

[18] In a case like this one, involving an "extremely long and complicated [medical] history," as Dr. Sood put it in June 2012 (prior to plaintiff's diagnoses for breast cancer, glaucoma, chronic pain syndrome, and her treatment for depression), R. 371, anyone looking through the record is likely to be able to find some evidence that could be used, when taken out of context, to try to impeach a claimant's subjective complaints of pain.  Given the non-adversarial nature of an administrative proceeding under the Act, and the Act's remedial purpose, an adjudicator must avoid giving too much weight to pieces of evidence that do not support an adverse credibility determination in light of the record viewed as a whole.

[19] <u>Metaxalone</u>, Medlineplus.gov, Drugs, Herbs & Supplements, https://medlineplus.gov/druginfo/meds/a682010.html (last revised Oct. 15, 2018).

prescription had been re-issued just ten days before. R.460. In light of these much more specific descriptions of plaintiff's pain, and the decision by her treating physician to prescribe additional painkillers, there is not substantial evidence to find that plaintiff was actually pain-free.

The ALJ also found that "[t]he evidence demonstrates that claimant sought no more than conservative care to manage her reported back pain, which tends to undermine the claimant's assertion that pain is significantly limiting." R. 72. The ALJ cited Exhibit 1F, the records from plaintiff's first pain specialist in Connecticut. The same exhibit states: "[Plaintiff] has failed to respond to conservative options alone and remains with high levels of pain. Under the circumstances, further options were discussed. . . I would consider interventional approaches potentially starting with lumbar transforaminal injections first. In the interim, medical management options were discussed and would be pursued a bit more aggressively." R. 373. Plaintiff subsequently received at least two rounds of transforaminal injections, even though she expressed discomfort with the procedure. Stipulation at *5, 6. She was unable to continue seeing the doctor due to insurance issues, R. 410, and the injections provided only temporary relief. Stipulation at *5,6. Accordingly, there is not substantial evidence in the

record to support the finding that "claimant sought no more than conservative care to manage her reported back pain."

No factor seems to have influenced the ALJ's decision more than plaintiff's ongoing attempts to maintain employment, which the ALJ repeatedly described as undermining her credibility as to her pain. R. 71-74. I think the ALJ erred in this regard.

For instance, the ALJ concluded that plaintiff's work pushing wheelchairs in an airport "undermines her assertion that she is unable to walk for more than 10 minutes or that she requires the use of an assistive device for ambulation."[20]  R. 73. But plaintiff's express testimony to the ALJ was that she "did wheelchair, and it was too much for me." R. 91. The ALJ then asked whether the wheelchair job required walking "most of the time," to which plaintiff responded, "I was walking, and I had two hip replacements," presumably to indicate that the walking presented a difficulty. R. 91-92. Later, when asked how long she could "stand to walk," plaintiff responded, "I can walk maybe . . . a good 10 minutes and then I have to sit down. That was a problem . . . with the wheelchair thing." R. 106-07. On this record, plaintiff's assertion that she is capable of about ten minutes of walking (with the aid of her cane) seems wholly credible.

_____

[20] Plaintiff correctly notes that a wheelchair, like a shopping cart, effectively functions as an assistive device for ambulation to the one pushing it. Plf.'s Mem., at *18.

Similarly, both the ALJ and the Commissioner's brief rely heavily on the fact that the claimant "alleges that she is limited in her daily activities due to pain" yet "testified that she works as a home health aide and performs cleaning and other chores for her clients." R. 73; see also Def.'s Mem., at *5. As the ALJ put it, "[t]he inconsistency between what [plaintiff] alleges she is able to do for herself and what she does for her clients undermines her credibility with regard to the level of limitations she experiences." R. 73. This adverse credibility finding is not well-supported. Yes, plaintiff did testify that she performs a variety of household chores for her clients as a home health worker. R. 90, 92. But she also testified that "it's painful for me to do these things," and that "once I leave my clients, I'm in excruciating pain at night." R. 106. As far as the record shows, no treating physician has ever expressed doubts about the reality or severity of plaintiff's pain.

Plaintiff testified that she is "trying to survive." R. 106. To that end, she performed work that caused her intense pain throughout the day, requiring an around-the-clock dosage of oxycodone, and left her in a state of excruciating pain at night. See R. 106 ("I find myself in positions that I have to put myself in . . . because, I'm trying to survive right now. But it's painful for me to do these things. And . . . once I leave my clients, I'm in excruciating pain at night, when I put my body

40

down."), 114 ("I'm working for a healthcare [sic] that is causing me even more pain, because I have to help girls that are older than me, that – even a more worse situation.  So I just need to help myself right now.  And I'm not in a position to do that."), R. 123 ("I, myself, prefer to do something, because I could never get paid enough; but I cannot continue the way that I'm going, just to maintain, when I know that I can't do it any longer.").

An ALJ can "discount a plaintiff's testimony [as to subjective pain] to the extent that it is inconsistent with medical evidence . . . and her own activities during the relevant period."  Morris v. Comm'r of Soc. Sec., No. 12-cv-1795 (MAD/CFH), 2014 WL 1451996, at *6 (N.D.N.Y. Apr. 14, 2014).  The medical evidence in the record indicates that multiple pain specialists over the course of nearly a decade found it necessary and proper to prescribe plaintiff an around-the-clock dose of oxycodone, along with an array of other painkillers.  Occasionally, over this nearly ten-year history of pain treatment, chart notes will indicate that plaintiff was "doing well," or was "asymptomatic."  These evidentiary "scintilla," viewed collectively in light of all the evidence, do not constitute substantial evidence.  See Williams, 859 F.2d at 258.  And plaintiff's own activities, including her work history, are not inconsistent with her claims of pain so much as they are

entirely consistent with a claimant trying – and frequently

failing – to work through her chronic pain.[21]

2. <u>Severity and Effect of Glaucoma and Eye Impairments</u>

The ALJ concluded that plaintiff suffered from two severe

disabilities – breast cancer grade II and degenerative disc

disease – and several non-severe impairments – hypertension,

diabetes mellitus, glaucoma, osteoporosis, and history of

reconstructive hip surgery.  R. 68.  As to the non-severe

impairments, the ALJ concluded that "the evidence does not

demonstrate that these conditions are severe within the meaning

_____

[21] One final example is also illustrative, although relatively
minor.  Plaintiff testified to the ALJ that she was capable of
sitting "a good half an hour" before she has to get up, and that
"sitting too long" was "a problem," noting that she was "leaning
more to my right" as she was talking to the ALJ because she was
in pain.  R. 106-07.  The ALJ did not inquire further, instead
moving on to ask about plaintiff's ability to bend and stoop.  R.
107.

    Just moments later, when asking the vocational expert a
standard hypothetical question about the job prospects of a
claimant with plaintiff's characteristics as the ALJ saw them,
the ALJ asked: "If the person, <u>after sitting for 45 minutes</u>,
would need to stand up to, but no more than five minutes, before
resuming a seated position . . . would that change those jobs
[available]?"  R. 122 (emphasis added).  The ALJ never explained
from what evidence she determined that plaintiff could sit
considerably longer than plaintiff claimed.  To the extent the
ALJ made that determination based on her own observation of
plaintiff, it is unpersuasive.  <u>See Soto v. Barnhart</u>, 242 F.
Supp. 2d 251, 257 (W.D.N.Y. 2003) ("An 'ALJ's observation that [a
claimant] sat through the hearing without apparent pain, being
that of a lay person, is entitled to but limited weight.'"
(quoting <u>Carroll v. Sec'y of Health & Human Servs.</u>, 705 F.2d 638,
645 (2d Cir. 1983)).  "Where it is well documented that the
plaintiff has endured this pain for many years, and has as a
result learned to tolerate such pain, I find it of very limited
value that the ALJ observed no <u>apparent signs</u> of distress."  <u>Id.</u>

of the statute." R. 68. Plaintiff argues that the ALJ's classification of some of her impairments as non-severe is "based in part on the paucity of medical evidence and in part on the complete absence of any meaningful Medical Source Statement. Had the ALJ developed the record it is quite possible or likely that some or all of these conditions would have been deemed to be severe." Plf.'s Mem., at *7. The Commissioner responds that it was plaintiff's burden to provide evidence,[22] and asserts that "the record contained enough information for the ALJ to make an informed decision." Def.'s Mem., at *4-*5. I conclude that, at least with regard to plaintiff's glaucoma, the ALJ's determination is not supported by substantial evidence.

A non-severe impairment is "only a slight abnormality" that "would have no more than a minimal effect on an individual's ability to work." Cardoza v. Comm'r of Social Sec., 353 F. Supp. 3d 267, 280 (S.D.N.Y. 2019) (quoting Rosario v. Apfel, No. 97-cv-5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19,1999)). A "severe" impairment is one that "impose[s] more than a minimal restriction on a person's ability to engage in basic work activities." Torres v. Shalala, 938 F. Supp. 211, 215 n.8 (S.D.N.Y. 1996). In

_____

[22] As both the regulations and Second Circuit case law make clear, see supra, the Commissioner retains an affirmative duty to fill out the administrative record on the claimant's behalf, especially but not exclusively when the claimant proceeds pro se.

other words, in the context of a disability benefits hearing, severity is not a high bar.

I agree with plaintiff that the ALJ's classification of her glaucoma as a non-severe impairment is based on an inadequate record and against the substantial weight of the record evidence. The ALJ's discussion of the plaintiff's glaucoma is, in its entirety, as follows:

> As for the claimant's reported diagnosis of glaucoma, treatment records in February 2015 document that the claimant's vision was 20/20 for near vision bilaterally and 20/70 for distance vision bilaterally (Exhibit 84). However, the examination notes that the claimant's vision was tested without correction and she was given a prescription and referral to indigent care for low cost prescription glasses (Exhibit 8F). As such, it appears the claimant's vision is not significantly limiting with correction and the evidence does not contain a definitive diagnosis of glaucoma (Exhibit 8F).

R. 69.

As the Commissioner acknowledges, Def.'s Mem., at *6, the ALJ's statement that the record does not contain a definitive diagnosis of glaucoma is incorrect. The record contains two diagnoses of glaucoma: the first on March 6, 2015, R. 522; the second on March 15, 2015. R. 55. On the second occasion, the the treating physician diagnosed "primary open-angle glaucoma" in a "severe stage" in "both eyes." R. 55. The Commissioner's rejoinder is to repeat the ALJ's assertion that "this did not affect Ms. Alford's ability to see well enough to work." Def.'s Mem., at *6.

Glaucoma can cause a deterioration of both visual acuity
–how sharp one's vision is – and visual field – how much one can
see.[23]  While the ALJ seems to have focused on visual acuity,
deterioration of the visual field may also impact a claimant's
ability to work, and it appears from the record that plaintiff
was experiencing deterioration of her visual field.[24]  Moreover,
plaintiff told her ophthalmologist that she was experiencing a
number of visual artifacts, including a "mercury like arc
temporally" appearing intermittently, "1 black spot that has now
become multiple" and "a shower down affect [sic] of several black
spots last week."  R. 53.  Her discussion of her vision with the
ALJ is also instructive:

    A: . . . I was told that I have cataracts – I mean,
    glaucoma, in my right eye.
    Q: Uh-huh.
    A: And --
    Q: What's your vision in your right eye. Do you know?
    A: –not that much in any – I haven't been to the eye
    doctor.  I haven't been able to go.  But it's gotten

---

[23] See Glaucoma, Merck Manual of Diagnosis & Therapy (20th ed.
2018), at 934-35.
[24] I am not in a position to attempt to interpret the
ophthalmologist's shorthand on page 55 of the record.  But I take
judicial notice of the fact that the diagnostic criteria of
"severe-stage" glaucoma requires (1) "optic nerve abnormalities
consistent with glaucoma," and one of (2a) "glaucomatous visual
field abnormalities in BOTH hemifields," or (2b) "loss within 5
degrees of fixation in at least one hemifield."  ICD-10 Glaucoma
Reference Guide, Am. Acad. of Ophthalmology (Feb. 2015),
available at:
https://www.aao.org/Assets/5adb14a6-7e5d-42ea-af51-3db772c4b0c2/6
36396205914600000/glaucoma-quick-reference-guide-update-8-29-17-p
df?inline=1.

worse.  I can hardly see at nighttime through my right
eye.
Q: Does it bother you during the day, or is it --
A: Yes.  I have --
Q: – just at night?
A:– no.  I have to keep blinking to focus out of this
right eye.  And it's not as clear as it used to be.  I
see --
ALJ: I'm going to turn now to the vocational expert.
R. 114-115.

More is required to adequately develop the record with

regard to plaintiff's glaucoma.  "The ALJ's duty to develop the

administrative record encompasses not only the duty to obtain a

claimant's medical records and reports, but also the duty to

question the claimant adequately about any subjective complaints

and the impact of the claimant's impairments on the claimant's

functional capacity."  Will ex rel. C.M.K. v. Comm'r of Social

Sec., 366 F. Supp. 3d 419, 424 (W.D.N.Y. 2019) (quoting Puckett

v. Berryhill, No. 17-cv-5392 (GBD)(KHP), 2018 WL 6061206, at *2

(S.D.N.Y. Nov. 20, 2018)).  The ALJ's brief questioning of

plaintiff fell short, especially because plaintiff's treating

physician described her glaucoma as "severe."  R. 55.  See Losco,

604 F. Supp. at 1020 (S.D.N.Y. 1985) ("[D]espite [medical

evidence from an eye doctor] and plaintiff's testimony that

plaintiff suffered blurred vision . . . the ALJ inquired only

briefly about the condition of plaintiff's eyes and the effect of

his impairment on his general functional capacity.").

The ALJ also erred in failing to obtain a medical source opinion from plaintiff's treating ophthalmologist. The general rule, derived from the regulations, is that the ALJ should request and consider "a medical source statement about what you can still do despite your impairment(s)." See Tankisi v. Comm'r of Social Sec., 521 F. App'x 29, 33 (2d Cir. 2013). However, if "the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity," then "remand is not . . . required." Id. at 34. In Tankisi, the Second Circuit held that remand was not necessary because, although the record did not contain a formal opinion on the claimant's residual functional capacity from her treating physicians, it did "include an assessment of [the claimant]'s limitations from a treating physician." Id.

There is no such assessment here regarding plaintiff's eye impairments, and the objective evidence only supports plaintiff's subjective complaints of blurriness and visual artifacts. Accordingly, while the record "contains a fair amount of entries as to" other impairments, it is insufficient as to her eye impairments, particularly glaucoma. See Sanchez v. Colvin, No. 13-cv-6303 (PAE), 2015 WL 736102, at *7 (S.D.N.Y. Feb. 20, 2015).

The ALJ's decision also contains no discussion of plaintiff's documented difficulty with her glaucoma medication. The Commissioner must take into account "[t]he type, dosage,

effectiveness, and side effects of any medication you take or
have taken to alleviate your pain or other symptoms." 20 C.F.R.
§ 404.1529(c)(3)(iv). Plaintiff was prescribed "MZM," or
methazolamide, to treat her glaucoma because her intraocular
pressure ("IOP") in the "mid-teens [was] likely too high for [her
optic] nerve."[25] R. 55. However, at the visit on March 15,
2016, plaintiff reported discontinuing the MZM because of
frequent urination. R. 53. Her IOP was measured twice for each
eye, and each measurement reported further elevations in her
IOP-values of 19 and 20 for her right eye and 19 and 19 for her
left eye. R. 54. The ophthalmologist ordered her to restart the
MZM, noting that her IOP was "too high." R. 53. He also advised
her to consult with Dr. Tamim. R. 55.

On April 19, 2016, after a series of visits in which Dr.
Tamim reported that plaintiff was suffering from depression,
plaintiff informed Dr. Tamim that she had "stopped the medication
for her glaucoma and . . . her mood had] been much more stable."
R. 48. She was "advised to follow up with her ophthalmologist
for an alternative treatment for her glaucoma as soon as
possible." R. 49. There are no follow-up records with the

---

[25] Loss of vision from glaucoma occurs when a build-up of
pressure within the eye damages the optic nerve. Methazolamide
treats glaucoma by reducing pressure in the eye. Methazolamide,
Medlineplus.gov, Drugs, Herbs & Supplements,
https://medlineplus.gov/druginfo/meds/a613034.html (last revised
Feb. 15, 2017).

ophthalmologist.    As a result, we do not know whether plaintiff resumed taking medication for her glaucoma and, if so, its impact on her ability to work.

Finally, as to both the issue of the plaintiff's pain and her eye impairments, the Commissioner's argument that gaps in the medical record should be excused because "the Defendant asked Ms. Alford on more than one occasion whether there were missing or outstanding medical records," Def.'s Mem., at *4, is clearly foreclosed by well-settled law.  See Losco, 604 F. Supp. at 1020 n.4 ("[T]his court holds as a matter of law that the ALJ cannot satisfy his 'heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts' merely by extending to a pro se claimant the opportunity to present relevant evidence.") (citation omitted).  Particularly "in view of [P]laintiff's pro se status" as well as "her actual performance at the administrative hearing, it is both unrealistic and unfair to expect that" simply offering plaintiff the opportunity to provide further evidence "will in practice yield a fully developed administrative record."  Id.

## IV. <u>Conclusion</u>

Accordingly, the decision is reversed and the case is remanded for further proceedings consistent with this ruling.

So ordered this 30th day of September 2019.

<pre>
                              /s/ RNC
                      Robert N. Chatigny
                   United States District Judge
</pre>